J-S06018-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| IN RE: INVOLUNTARY TERMINATION OF PARENTAL RIGHTS TO D.V.M.R. | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| APPEAL OF: G.R., FATHER | No. 1266 MDA 2015 |

Appeal from the Order Entered June 22, 2015
In the Court of Common Pleas of Centre County
Orphans' Court at No(s): 3956-2014

BEFORE:  PANELLA, J., MUNDY, J., and STEVENS, P.J.E.*

MEMORANDUM BY MUNDY, J.:                    **FILED MARCH 04, 2016**

Appellant, G.R. (Father) appeals from the June 22, 2015 order involuntarily terminating his parental rights to his minor son, D.V.M.R., born in March 2011.[1]  After careful review, we affirm.[2]

The orphans' court summarized the factual history of this matter as follows.

> [Centre County Children and Youth Services (CYS)] was involved with [Mother] and [Father] concerning their older son, [N.R.].  [N.R.] was

---

[1] The parental rights of D.V.M.R.'s mother, L.W. (Mother), were terminated by the same order.  The disposition of Mother's appeal is by separate memorandum at docket number 1258 MDA 2015.

[2] The Guardian *Ad Litem* has filed a brief in support of the involuntary termination decree.

*Former Justice specially assigned to the Superior Court.

adjudicated dependent in October, 2009. [Father] was incarcerated at the time [N.R.] was found dependent. Family Intervention Cris[i]s Services (FICS) was contacted to take reunification steps with [N.R.] and the efforts began with [Mother] in November, 2009 and for [Father] in March, 2010, when he was released from Blair County Correctional Facility. The reunification efforts were not successful as [Mother] had no housing, did not participate in lifestyle checks with FICS, and did not schedule sessions with reunification counselors. In August, 2010, there was no progress in reunification and on December 30, 2010, reunification services ended as the parents failed to meet the required goals.

When [D.V.M.R.] was born in March, 2011, new services were provided by FICS since [D.V.M.R.] was in the home with the parents and reunification efforts were again commenced for [N.R.]. There was progress toward reunification and things went relatively well. The reunification efforts ended when [Mother] was incarcerated in December, 2011. [Father] had a warrant out for his arrest at that time and his whereabouts were unknown. [Mother] was to be incarcerated until February, 2014, and [Father] was incarcerated through September, 2012.

Orphans' Court Opinion, 6/22/15, at 2.

On March 10, 2014, CYS filed a petition to involuntarily terminate the parental rights of Father and Mother. Termination hearings were held on June 9, 2014, July 30, 2014, and October 31, 2014, during which the orphans' court heard the testimony of former CYS caseworker, Lindsay Schreffler; D.V.M.R.'s foster father, J.F. (Foster Father); D.V.M.R.'s foster mother, M.J.F. (Foster Mother); CYS caseworker, Tammi Eddy; Mother's maternal aunt, M.M.-K.; Mother; Father's mother, P.K. (Paternal Grandmother); and Father. On November 24, 2014, before the orphans'

court ruled on the termination petition, CYS filed a petition to reopen the record in order to present new evidence concerning ongoing drug use by Mother. The orphans' court granted the petition, and additional testimony was heard on January 2, 2015. Specifically, the orphans' court heard the testimony of psychiatrist, Elmer Cupino, M.D.; and CYS caseworker, Brittany Werner.

On June 22, 2015, the orphans' court entered its order involuntarily terminating Father's parental rights to D.V.M.R. Father timely filed a notice of appeal on July 22, 2015, along with a concise statement of errors complained of on appeal pursuant to Pennsylvania Rule of Appellate Procedure 1925(a)(2)(i). The orphans' court has adopted its June 22, 2015 opinion for purposes of Rule 1925(a).

Father now raises the following issues for our review.

> I. Did the [orphans'] court err in finding clear and convincing evidence to justify termination pursuant to either 23 Pa. C.S.A. § 2511(a)(2), (a)(5), or (a)(8)?
>
> II. Did the [orphans'] court err in concluding that termination would best serve the needs and welfare of the child, more specifically did the [orphans'] court err in failing to give adequate consideration to the bond between siblings and the impact of termination on the bond between the minor child and his natural father?

Father's Brief at 4 (unnecessary capitalization omitted).

We consider Father's claims mindful of our well-settled standard of review.

- 3 -

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S.A. §§ 2101-2938, which requires a bifurcated analysis.

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

In this case, the orphans' court terminated Father's parental rights pursuant to Sections 2511(a)(2), (5), (8), and (b).  We need only agree with the orphans' court as to any one subsection of Section 2511(a), as well as Section 2511(b), in order to affirm.  *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*), *appeal denied*, 863 A.2d 1141 (Pa. 2004).  Here, we analyze the orphans' court's decision to terminate under Sections 2511(a)(2) and (b), which provide as follows.

**§ 2511. Grounds for involuntary termination**

**(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

…

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

…

**(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child.  The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.  With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the

conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2), (b).

We first address whether the orphans' court abused its discretion by terminating Father's parental rights pursuant to Section 2511(a)(2). "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." *In re A.L.D.*, 797 A.2d 326, 337 (Pa. Super. 2002) (citations omitted). "[A] parent's incarceration is relevant to the section (a)(2) analysis and, depending on the circumstances of the case, it may be dispositive of a parent's ability to provide the 'essential parental care, control or subsistence' that the section contemplates." *In re A.D.*, 93 A.3d 888, 897 (Pa. Super. 2014), *quoting In re Adoption of S.P.*, 47 A.3d 817 (Pa. 2012).

Instantly, the orphans' court found that Father has engaged in a "repeated pattern of criminal activity" which has caused D.V.M.R. to be without essential parental care. Orphans' Court Opinion, 6/22/15, at 10. The orphans' court further found that Father is unable to remedy this issue. *Id.* Father argues that he has remedied the situation which prevented him from caring for D.V.M.R., in that he is no longer incarcerated. Father's Brief at 15. Father also contends that it was improper to terminate his parental

rights because he never was offered reunification services with respect to D.V.M.R. *Id.*

After a thorough review of the record in this matter, we conclude that the orphans' court did not abuse its discretion by involuntarily terminating Father's parental rights to D.V.M.R. During the termination hearing, CYS caseworker, Tammi Eddy, testified that she was assigned to this matter in October of 2013. N.T., 6/9/14 (Part 2), at 113. Ms. Eddy believed that Father was released from incarceration in Centre County on January 20, 2012. *Id.* at 76. However, she noted that, "my understanding from the agency record is that he was on a detainer to Blair County at that point too." *Id.* Ms. Eddy did not have the dates of Father's incarceration in Blair County, but she provided several additional dates during which Father was incarcerated in Centre County. *Id.* at 76-77. Father was incarcerated at the Centre County Correctional Facility from March 15, 2012, until March 20, 2012; from April 2, 2012, until April 3, 2012; from May 21, 2012, until May 23, 2012; from June 1, 2012, until June 29, 2012; from August 20, 2012, until August 21, 2012, and from October 21, 2013, until November 4, 2013.[3]

_____

[3] Counsel for Father indicated that Father was incarcerated in Blair County for an unspecified period of time, and that several of these dates represent "transportation from Blair County where he is in Centre County for a day[.]" N.T., 6/9/14 (Part 2), at 77. Ms. Eddy stated that Father's most recent period of incarceration resulted from a "Domestic Relations incident." *Id.* at 78. Ms. Eddy reported that, as of October of 2013, Father owed in excess of $18,000 in child support. *Id.* at 81.

*Id.* at 76-78. Ms. Eddy stated that Father currently is facing charges due to an incident which took place on December 26, 2012. *Id.* at 78. Ms. Eddy specified that Father was charged with "driving while driving privileges suspended, period for required lighted lamps, and habitual offenders[.]" *Id.*

Father admitted that he has a history of criminal convictions dating back to 1992. N.T., 10/31/14, at 47. Specifically, Father had convictions in 1992, 2003, 2004, 2006, 2007, and 2008, including three convictions for driving under the influence. *Id.* at 47-49, 51. Father explained that he was incarcerated on December 13, 2011, due to either a receiving stolen property charge, or because he violated his probation. *Id.* at 28, 66. Father believed that he was released from incarceration in approximately August or September of 2012. *Id.* at 39, 61, 66. Father stated that he again was incarcerated in the fall of 2013 "for contempt of D.V.M.R. support." *Id.* at 26-27. With respect to his current criminal charges, Father indicated that his conviction is on appeal. *Id.* at 46. Father admitted that, if his judgment of sentence is affirmed, he will be incarcerated for a minimum of sixty days and a maximum of twenty-three months. *Id.*

Accordingly, the record supports the conclusion of the orphans' court that Father is incapable of providing D.V.M.R. with essential parental care, control, or subsistence necessary for D.V.M.R.'s physical or mental well-being. Moreover, Father cannot, or will not, remedy his parental incapacity. Father has an extensive criminal history, which has resulted in two periods

of incarceration during D.V.M.R.'s life. At the time Father testified during the termination hearing, he was facing yet another possible incarceration.[4] Father has proven that he is either unwilling or incapable of curbing his criminal tendencies, and it was proper for the orphans' court to conclude that D.V.M.R. should no longer be denied permanency.[5] *In re Adoption of M.E.P.*, 825 A.2d 1266, 1276 (Pa. Super. 2003) ("[a] child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting[]") (citations omitted).

Additionally, we reject Father's contention that his parental rights should not have been terminated because CYS failed to provide him with reunification services with respect to D.V.M.R. Our Supreme Court recently held that reasonable reunification efforts are not necessary to support a decree terminating parental rights pursuant to Section 2511(a)(2). We have discussed the Court's decision as follows.

> In *In re D.C.D.*, ___ Pa. ___, 105 A.3d 662 (2014), our Supreme Court analyzed the language of Section 2511(a)(2) of the Adoption Act, as well as Section 6351 of the Juvenile Act, 42 Pa.C.S.A. § 6351. The Court reasoned that, while "reasonable efforts may

---

[4] This Court affirmed Father's judgment of sentence on December 19, 2014, and our Supreme Court denied *allocatur* on June 11, 2015.

[5] In his brief, Father appears to indicate that incarceration cannot be "the sole basis" for terminating a person's parental rights. Father's Brief at 15. As noted *supra*, our Supreme Court has held that incarceration may be "dispositive of a parent's ability to provide [] 'essential parental care, control or subsistence' …." *See A.D.*, *supra* at 897.

be relevant to a court's consideration of both the grounds for termination and the best interests of the child," neither of these provisions, when read together or individually, requires reasonable efforts. The Court also concluded that reasonable efforts were not required to protect a parent's constitutional right to the care, custody, and control of his or her child….

*In re Adoption of C.J.P.*, 114 A.3d 1046, 1055 (Pa. Super. 2015) (some citations omitted). Thus, Father is not entitled to relief.

We next consider whether the trial court abused its discretion by terminating Father's parental rights pursuant to Section 2511(b). We have discussed our analysis under Section 2511(b) as follows.

> Section 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. As this Court has explained, Section 2511(b) does not explicitly require a bonding analysis and the term 'bond' is not defined in the Adoption Act. Case law, however, provides that analysis of the emotional bond, if any, between parent and child is a factor to be considered as part of our analysis. While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.
>
> > [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be

- 10 -

> severed without detrimental effects on the
> child.

*In re Adoption of C.D.R.*, 111 A.3d 1212, 1219 (Pa. Super. 2015), *quoting*

*In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011) (quotation marks and

citations omitted).

Here, the orphans' court found that terminating the parental rights of

Father and Mother would best serve the needs and welfare of D.V.M.R.

Orphans' Court Opinion, 6/22/15, at 10-11.  The orphans' court explained

that it considered the bond between D.V.M.R. and his parents, and

concluded that D.V.M.R. would not suffer emotionally if parental rights are

terminated.  *Id.* at 10.  The orphans' court observed that D.V.M.R. shared a

stronger bond with his foster parents.  *Id.*  Finally, the orphans' court noted

that it would be best for D.V.M.R. to continue residing with his foster

parents, even though this will prevent D.V.M.R. from residing with his

brother N.R.  *Id.* at 11.  The orphans' court expressed hope that D.V.M.R.'s

foster parents would work with N.R.'s foster parents, and with CYS, to foster

a relationship between D.V.M.R. and N.R.  *Id.*

Father argues that it was improper to terminate Father's parental

rights because the orphans' court failed to discuss the harm that may befall

D.V.M.R. if his bond with N.R. is severed.  Father's Brief at 17-19.  Father

contends that the orphans' court also failed to provide a "substantive

evaluation" of the bond between D.V.M.R. and Father.  *Id.* at 20.  Father

insists that a bonding evaluation should have been conducted with respect to D.V.M.R. and N.R., and with respect to D.V.M.R. and Father. *Id.* at 19-20.

We again discern no abuse of discretion. Ms. Eddy testified that she did not believe that D.V.M.R. would suffer emotional harm if the parental rights of Father and Mother are terminated. N.T., 6/9/14 (Part 2), at 100. Ms. Eddy explained that she has attended approximately four visits between D.V.M.R. and his parents. *Id.* at 116-17. In addition, Ms. Eddy has transported D.V.M.R. back from visits. *Id.* at 95-96. While being driven back after a visit, D.V.M.R. frequently asks when they are going to be home, and says, "I want Mommy [J.], I want my mommy," meaning Foster Mother. *Id.* at 96. In contrast, Ms. Eddy described an incident during which she arrived at the foster home, and D.V.M.R. mistakenly believed that she was there to take him to a visit with his parents. *Id.* at 96. D.V.M.R. "ran upstairs screaming [']I don't want to go, I don't want to go.['] He then started throwing books at the [foster parents'] daughter."[6] *Id.* at 96-97.

Concerning D.V.M.R.'s bond with his brother N.R., Foster Mother testified that D.V.M.R. and N.R. initially were placed together in her home. *Id.* at 39-40. However, N.R. engaged in numerous inappropriate behaviors, including acts of violence against D.V.M.R. *Id.* at 41-43. Foster Mother and

_____

[6] While describing this incident, Ms. Eddy used N.R.'s first name rather than D.V.M.R.'s first name. However, it is clear from the context that she was referring to D.V.M.R.

Foster Father struggled to ensure D.V.M.R.'s safety, and Foster Mother called CYS asking for assistance. *Id.* at 40, 42, 52. As a result, N.R. was sent to be evaluated at a facility called Kids Peace. *Id.* at 53-54. During N.R.'s time at Kids Peace, it was determined that N.R. should not reside with other children. *Id.* at 56. Thus, N.R. was placed in the care of Paternal Grandmother. *Id.* Foster Mother noted that N.R. was present during some of D.V.M.R.'s visits with Mother and Father, and that D.V.M.R. is more willing to attend visits if he knows N.R. will be there. *Id.* at 49-50, 61-62. Foster Mother indicated that she would support D.V.M.R. and N.R. maintaining a relationship, even after she and Foster Father adopt D.V.M.R. *Id.* at 62.

Thus, the record supports the conclusion of the orphans' court that it would best serve D.V.M.R.'s needs and welfare to terminate Father's parental rights. D.V.M.R. was removed from Father's care in December of 2011, when he was about nine months old. D.V.M.R. was placed with his current foster parents in March of 2012, and has resided with them continuously since that time. N.T., 6/9/14 (Part 1), at 34, 88. While Father suggests that the orphans' court should have procured a bonding evaluation, it is well-settled that a court in a termination proceeding "is not required by statute or precedent to order a formal bonding evaluation be performed by an expert." *In re K.K.R.-S.*, 958 A.2d 529, 534 (Pa. Super. 2008) (citation omitted). The orphans' court was well within its discretion when it relied on

the testimony of Ms. Eddy, among others, to conclude that D.V.M.R. would not suffer emotional harm if Father's parental rights are terminated.

Moreover, it was proper for the orphans' court to conclude that D.V.M.R.'s relationship with N.R. should not prevent Father's parental rights from being terminated. As Father admits, "the rule against separation of siblings is not necessarily controlling in an involuntarily termination case." Father's Brief at 17, *citing **In Re R.P.***, 956 A.2d 449 (Pa. Super. 2008).[7] We agree with the orphans' court that whatever bond the brothers share is outweighed in the instant matter by other concerns, including D.V.M.R.'s bond with his foster parents, D.V.M.R.'s need for permanence and stability, and by Father's repeated incarcerations. As noted *supra*, Foster Mother

---

[7] ***R.P.*** was a goal change case in which a panel of this Court considered whether a trial court abused its discretion by separating R.P. and his sibling, L.P. ***R.P.***, ***supra*** at 457-58. This Court held that Mother waived this claim by failing to raise it before the trial court. ***Id.*** at 457. This Court further noted that, even if this claim had properly been preserved, Mother's argument was specious, given that R.P. remained hospitalized at the time of the permanency review hearing, and it was impossible to place him with L.P. ***Id.*** at 457-58. Finally, the Court explained as follows.

> While a decision ultimately may be made to place the children together in the future, the general rule disfavoring separation of siblings … is not controlling as no absolute constitutional or statutory right to be raised with a sibling yet exists in our jurisprudence. The court, in any event, has discretion to place R.P. and L.P. according to the individual best interests of each child. The health, safety, and welfare of each child supersede all other considerations.

***Id.*** at 458 (citations and quotation marks omitted).

indicated during the termination hearing that she would support D.V.M.R. and N.R maintaining a relationship, even after she has adopted D.V.M.R.[8]

Based on the foregoing, we conclude that the orphans' court did not abuse its discretion by involuntarily terminating Father's parental rights to D.V.M.R. **See T.S.M.**, **supra**. Accordingly, we affirm the June 22, 2015 order of the orphans' court.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/4/2016

---

[8] Similarly, Foster Father stated, "I would make sure that those boys stayed in contact with each other, seen [sic] each other. I have no problem with them communicating with each other…. I assure you that … they will be in contact with each other." N.T., 6/9/14 (Part 2), at 26.